## RUDLOE and GULF SPECIMEN COMPANY, INC. v DICKERSON BAYSHORE, INC. and STATE OF FLORIDA, DEPT. OF ENVIRONMENTAL REGULATION

Case No. 87-3175

State of Florida, Division of Administrative Hearings

April 25, 1988

### APPEARANCES OF COUNSEL

**Charles A. McMurry** for petitioners.

**R. L Caleen, Jr. and Segundo J. Fernandez, Oertel and Hoffman,** for respondent, Dickerson Bayshore, Inc.

**Karen A. Brodeen,** for respondent, Department of Environmental Regulation

### OPINION OF THE COURT

ROBERT BENTON, II, Hearing Officer.

*RECOMMENDED ORDER*

This matter came on for hearing in Tallahassee, Florida, before

Robert T. Benton, II, Hearing Officer of the Division of Administrative Hearings, on December 17, 1987; the hearing concluded on December 21, 1987. On January 22, 1988, the Division of Administrative Hearings received the hearing transcript, and the parties filed proposed recommended orders on February 22, 1988. The attached appendix addresses proposed findings of fact by number. As discussed at the hearing (T. 960), in agreeing to take thirty days for proposed recommended orders, the parties waived the time requirements of Rule 28-5.402, Florida Administrative Code, in accordance with Rule 22I-6.031(2), Florida Administrative Code.

These proceedings arise on an application Dickerson Bayshore, Inc. (DBI) filed for a permit to construct a 71-slip marina on the western shore of Dickerson Bay in Wakulla County. The Department of Environmental Regulation (DER) issued an intent to deny the application as initially presented. After DBI modified the application to meet DER's objections, however, DER issued an intent to grant the permit. In response, petitioners, who object to issuance of a permit, requested formal administrative proceedings. In accordance with Section 120.57(1)(b)3., Florida Statutes (1987), DER transmitted the matter to the Division of Administrative Hearings.

When the parties filed their prehearing stipulation on December 7, 1987, DER again indicated an intention to deny DBI's application, amendment notwithstanding, this time on account of the shellfish in the area. Changing its position a third time, however, DER indicated, by filing a notice of change in position on December 14, 1987, that it favored granting DBI a permit, and this is the position DER takes in its proposed recommended order.

## ISSUE

Whether DBI has given reasonable assurance that its amended application to construct a marina conforms to the criteria set out in Section 403.918, Florida Statutes (1987) and Rule 17-12.070, Florida Administrative Code?

### Evidence Adduced

At final hearing, DBI presented the testimony of Dan Garlick, an expert in marine biology, the evaluation of dredge and fill application, and in wetlands ecology; Linda Day, County Coordinator of Wakulla County; Ronald Fred Crum, President of DBI; Daniel McCanahay, a sports fishing guide; Jim Cox, an expert on wood storks; and John Trumble, formerly a crabber. DBI's Exhibits Nos. 1 through 23 and 25 through 29 were received in evidence.

DER presented the testimony of Kenneth Echternacht, Ph.D., an expert in hydrographic engineering, meterology and physical oceanography; Todd Campbell, an expert on biological impacts on dredge and fill projects; and W. Richard Fancher, an expert in the biological, water quality and stormwater impacts of dredge and fill projects. DER's Exhibit No. 1 was received in evidence.

Petitioners presented the testimony of Jim Stevenson, an expert on wood storks, their habits and migration patterns; Larry Ogren, an expert on the Kemp's ridley sea turtle; David Heil, an expert on the classification of shellfish harvesting waters and water quality as it relates to such classification; Ann Rudloe, Ph.D., an expert in marine biology and marine ecosystems; Robert J. Livingston, Ph.D., an expert in marine biology, marine ecology, impacts on marine life and wildlife, ecology, water quality, and toxicology in water and sediments; and petitioner Jack Rudloe, an expert in general marine biology, including the Kemp's ridley sea turtle and the natural environment of estuarine systems, including wood storks. Petitioners' Exhibits Nos. 1 through 4 were marked for identification but not received in evidence. Joint Exhibit No. 1 was received into evidence as a post-hearing exhibit.

### FINDINGS OF FACT

1. In conjunction with the proposed marina under challenge here, DBI contemplates certain upland development. Aside from "very tenative" plans for an "80 dry slip" boat storage facility, DBI's president, Ronald F. Crum, wants to convert an old crab plant into a restaurant, and build 40 single-family units on the more than eight acres he owns or controls on the shore of Dickerson Bay in Wakulla County.

2. Protected on the west by the mainland off which is would stand, if built, the marina would be sheltered by Hungry Point a few hundred feet to the south; and, to a lesser extent, by Porter Island a half mile to the east, and by the mainland across Dickerson Bay a mile or two north. About two miles across from north to sough and somewhat less wide from east to west, Dickerson Bay communicates with Levy and Apalachee Bays to the south and east. Further east, Apalachee Bay opens into the northeastern Gulf of Mexico.

3. The site proposed for the marina lies near Rock Landing just south of the public dock in Panacea, within 40 yards, at the closest point, of a lighted channel maintained at a depth of 12 feet by the Army Corps of Engineers. The three-mile long channel travels across Dickerson Bay, rounds Hungry Point and enters Apalachee Bay through the pass between Porter Island and Mashes Island.

4. Petitioner Jack Rudloe and his wife, Dr. Ann I.M. Rudloe, live on Dickerson Bay, north of the site proposed for the marina. The Rudloes use the bay for recreation. In the laboratory that they and the corporate petitioner operate, tanks house specimens of marine life, many ultimately bound for use in research on such questions as the toxicity of oil drilling muds.

5. Pollution in Dickerson Bay might contaminate the water in petitioners' uptake lines and holding tanks; they have found no practical way to filter the bay water. Even if petitioners' specimens survived contamination, the effects of contamination could render mysid shrimp and other organisms useless for the experimental purposes for which petitioners sell them. A good fraction of the specimens come from Dickerson Bay, to begin with.

6. DER is the state agency with primary responsibility for evaluating the general impact of dredge and fill projects, including marinas, on waters of the state. DER also has certain authority and responsibilities to abate pollution.

### The Status Quo

7. "Right now you've got a site that, maybe, chaos is not the best word, but there's really no control." (T. 605) Despite occasional visits to the Panacea dock by Wakulla County clean-up crews, the upland area, including the Crum property on which fishermen park their cars, is usually strewn with garbage. Mr. Crum, whose property abuts the county's, has himself hauled off a lot of trash, including some 2,000 abandoned crab traps. Fishermen regularly dump fish remains at the foot of the dock. One day recently about 15 swollen gar, each about six feet long and a foot in diameter, lay rotting on the boat ramp which straddles the line beween the county property and the applicant's. (T. 238)

8. The municipal dock serves mainly commercial fishermen, perhaps because some of the commercial fishermen have untied sport fishing boats left there. Oystermen and crabbers alike use boats that are open, about 24 feet long, and powered by outboard motors. Lacking heads, these boats make do with five gallon buckets which are emptied over the side. Mullet boats and shrimpers, ranging up to 40 feet, also dock at Rock Landing. Rarely does a 75-foot boat put in there, but it does happen.

9. At the time of the hearing, a half dozen or so boats were tied up at the dock. In the spring, when mullet laden with roe inspire the largest numbers, as many as 40 bats may raft two or three deep along

194

the municipal dock. On average, maybe 15 to 20 boats tie up there. In the absence of outboard mooring piles, they set anchors in an effort to keep free of the dock.

10. For many years, Mr. Crum, who is in the fuel business, among others, or an employee of his, used to back a fuel truck out onto the municipal dock, unwind a one-inch hose, and dispense gasoline to boats moored there. By now, Mr. Crum has "pretty well stopped . . . [because he] knew somebody was going to back off the dock," (T. 237) if the practice continued. Aggravating pollution from spilled fuel has been grease, oil and gasoline entering the water when boats sink at dockside, reportedly a common occurrence, one which was attributed to the dock's being so high that the rising tide traps boats that float underneath at low tide. The boats drag anchors in high winds.

11. In 1981, Panacea Harbor was identified as a "major area of concern" based "on consistent high fecal coliform counts which appeared to be independent of [temperature, rainfall and tidal influence]." DBI's Exhibit No. 7, p. 28. The higher the temperature, the longer the bacteria live, and the tide affects how long they remain in the bay.

12. When it rans, water runs off into Dickerson Bay from Panacea, whose population of 866, although now relying on septic tanks, plans to install sewers and build a wastewater treatment plant. Construction on the $4,000,000 project has already begun. But the 1981 study found unacceptably high fecal coniform counts, regardless of temperature, tide or how much rain had recently washed over the ground.

13. Two "out of a 8 stations sampled were in excess of Class III total coliform criteria and 7 out of 8 stations sampled were in excess of fecal coliform criteria." DBI's Exhibit No. 8, p. 22. Except near the municipal dock, where tidal action is apparently greatest, Class III coliform standards were commonly exceeded. Even there, fecal coliform counts exceeded Class II standards. "The southernmost shoreline station was a pier (Xg(TC) = 438.7; Xg(FC) - 90.16) that is the terminal point of the maintained shipping channel in Dickerson Bay." DBI's Exhibit No. 8, p. 25.

14. A 1982 study, DBI's Exhibit No. 8, suggests that septic tank leachate is a more important source of Dickerson Bay's fecal coliform than surface runoff is. A marsh along the edge of most of the applicant's property filters stormwater runoff somewhat before it enters the harbor, but stormwater flows unimpeded and unfiltered down the boat launching ramp. Fishermen and wildlife (including wood storks, applicant's counsel brought out) also contribute.

## Pollution Inevitable

15. "[M]arinas are the source of various pollutants," DBI's Exhibit No. 11, p. 2, petroleum among them. "Oil and greases are expected impacts of any marina site." DER's Exhibit No. 1. Anti-fouling bottom paint, containing cooper or other (T. 690) toxic ingredients, flakes off boat hulls and makes it way into the sediment. Studies in California associate elevated levels of polychlorinated biphenyls with marinas.

16. Oil and gasoline spills cause only temporary changes in water quality, but a residue "will be often lodged in the sediments," (T. 759) a residue which can later re-enter the water column. Spills can occur in fueling. "Automatic bilge pumps can also place a substantial load of these chemicals into the water body." DER's Exhibit No. 1.

17. Also likely to end up in sediments in the vicinity of marinas are cadmium, chromium, lead, tin and zinc. Because these pollutants kill off certain organisms in the sediments or destroy their ability to reproduce, only "opportunistic, resilient or resistent [benthic] species can survive." (T. 261) Unless ambient pollution has already depressed benthic biota significantly, as seems to be true in the present case, chemical pollutants from a marina will diminish a variety of bottom species in the area, in violation of DER's biological integrity standard.

18. In addition, unless a marina is "adequately flushed . . . hypereutrophication . . . [causes] reductions in the dissolved oxygen in the marina site which leads to degradation in terms of the biological integrity of the system." (T. 758-9) Dissolved oxygen levels vary naturally with changes in water depth and temperature, but fish carcasses and other organic waste, if not dissipated, can contribute to depressed levels. From fish down, marine organisms need dissolved oxygen to live. Marinas are commonly sources of fecal coliform and associated pathogenic bacteria.

## Monitoring Proposed

19. DBI proposed to build in two phases. After construction of the initial 40 slips, it would install a monitoring system, and would begin construction of phase two, only if the monitoring program failed to show that phase one had caused pollution in violation of DER standards. DBI has stipulated:

4. The marina will consist of 71-slips to be constructed in two phases: the first phase to consist of 40-slips; the second to consist of 31-slips, which would be constructed at least one year after start-up of the first 40-slips.

5. Construction of the second phase, however, will not commence if

the Monitoring Program described below shows that the 40-slip marina has caused violations of DER water quality standards. If such violations are shown, Dickerson Bayshore, Inc., shall submit to DER and implement a plan of corrective action to abate and prevent further violations. Under such circumstances, construction of the second stage would not take place unless the Monitoring Program shows no further vioations have occurred during the year following implementation of the corrective action;

6. The Monitoring Program will consist of the following:

Location:

1. .25 miles case of marine in C.O.E. channel

2. .9 miles off Fiddler's Point

3. .5 miles north of marina in Dickerson Bay

4. Marina site

Frequency:

Once for background conditions prior to construction. Beginning within one month of completion of Phase I, monthly at each station for three consecutive months, then every third month fro at least one year.

A. From mid-depth

 1. Biochemical Oxygen Demand

 2. Arsenic

 3. Copper

 4. Zinc

 5. Lead

 6. Cadmium

 7. Ammonia

B. From the surface

 1. Oils and greases

 2. Fecal coliform: fecal strep

C. From the top foot, mid-depth and bottom foot, in early morning and late afternoon.

 1. Dissolved oxygen

 2. Temperature

 3. Conductivity

4. Turbidity

5. pH

All monitoring data shall be submitted within one week of analysis with documents containing the following information: (1) permit number; (2) dates of sampling and analysis; (3) a statement describing the methods used in collection, handling, storage and analysis of the samples; (4) a map indicating the sampling locations and (5) a statement by the individual responsible for implementation of the sampling program concerning the authenticity, precision, limits of detection and accuracy of the data.

Monitoring reports shall also include the following information for each sample that is taken:

(1) Time of day samples taken;

(2) water temperature (C)

(3) depth of water body;

(4) depth of sample;

(5) antecedent weather conditions; and

(6) wind direction and velocity.

If monitoring reveals apparent violations of State Water Quality Standards for turbidity, construction activities shall cease immediately and not resume until corrective measures have been taken and turbidity has returned to acceptable levels. Any such occurrence shall also be immediately reported to the Department of Environmental Regulation, Pensacola.

Monitoring reports shall be submitted to the Bureau of Permitting In Tallahassee and to the Department of Environmental Regulation, Pensacola. Failure to submit reports in a timely manner constitutes grounds for revocation of the permit.

7. Dickerson Bayshore, Inc. will leave a 50 foot wide buffer of uplands landward of emergent wetlands where upland vegetation occurs, along the westernmost portion of the site of the proposed marina and will maintain this buffer in the following manner:

a. No wood species greater than 3″ DBH shall be removed;

b. A grassed swale berm shall be placed along the landward border of the buffer zone;

c. Only pile-supported non-habitable structures, without roofs, shall be allowed in the buffer zone.

DBI's monitoring proposals evidence commendable ecological concern.

198

Perhaps they are what persuaded DER to reverse its position for the third time.

20. The weight of the credible expert testimony, however, was to the effect that only a much more elaborate and expensive program than that proposed could reliably determine what violatoins should be attributed to any particular source. The detection problem is exacerbated both by the number of sources contributing pollution to Dickerson Bay and by the transitory character of spills and other violations common in marinas.

### State of the Art

21. The marina DBI proposed would consist of four main piers. Nearest the municipal dock would be a single 130-foot loading dock, originally designed as a fueling dock. Paralleling this single pier, the other three would extend from a common, perpendicular walkway, joining the landward ends of the three piers to a second walkway leading ashore.

> The over-water surface area of the marina, computed by drawing a line around the perimeter of the dock structures . . . [and adding] the 900 square foot walkway and the separate 650 square foot fueling dock . . . [would total] 55,453 square feet. DER's Exhibit No. 1.

Jutting out perpendicularly from each of the three main piers at intervals of 30 feet, finger piers would create most, if not all, of the 71 slips the project is designed to yield.

22. DBI proposes various measures to mitigate adverse water quality effects anticipated from its project. Instead of creosote soaked wooden piles, which can leak toxic substances into the water, DBI plans to use pre-cast concrete. Fuel lines would lead from shore to the end of the dock next to the loading dock, in which DBI would install automatic shut off valves, designed to stop the flow of fuel, if a fuel line sprung a leak. DBI plans to dispense only unleaded gasoline lest its fueling operations give rise to high lead concentrations in the sediment that might otherwise attend "inevitable gasoline spills." (T. 764) To the extent boat owners availed themselves of the proposed fueling operation, it would presumably eliminate whatever hazard to the environment present practices pose. But at least one witness expressed skepticism at the prospect of outboard motor owners' willingness to give up leaded gasoline.

23. DBI proposed to "install a 'pan' under the fuel dock in a manner which will minimize spillage." The evidence left some doubt about the practicality of this proposal, however, and did not answer the question

**199**

of fire safety. DBI has also undertaken to maintain absorbent materials and a spill boom on site, to contain major spills. The harbor master DBI plans to hire would oversee fueling and, if need be, deployment of the spill boom.

24. A harbor master is to be available on a 24-hour basis for these and other duties, although he would not necessarily live at the marina. As part of the harbor master's responsibilities in connection with mitigating organic pollution, he would "encourage" the use of trash receptacles and upland fish cleaning facilities DBI would provide. He would enforce a prohibition against "non transient" live-aboards, maintain restrooms and sewage pumpout facilities DBI would build, and try to enforce a prohibition against through hull discharges from heads.

25. DBI has stipulated to detailed permit conditions and has agreed to post a bond to guarantee compliance:

1. Dickerson Bayshore, Inc. agrees that, prior to undertaking construction under any permit resulting from this proceeding, it will post a bond or other proof of financial responsibility acceptable to all parties for the purpose of assuring compliance with all conditions of the permit;

2. Dickerson Bayshore, Inc. agrees to prohibit boats with heads capable of discharging sewage to surface waters, and accepts an enforceable permit condition to the following effect:

a. No boats containing heads capable of discharging wastewater through the hull will be allowed to use the Marina.

3. Modifications contained in letters from Dan Garlick to Norm Richards dated May 13, 1987 and Ms. Linda Day, County Coordinator for Wakulla County, dated September 25, 1987, and to Gerald Neubauer have been identified as exhibits.

On August 13, Mr. Garlick wrote DER the letter to which the stipulation refers, modifying the project in the following particulars:

1). The marina area has been extended to provide 3 to 4 feet of water at *mean low water* increasing the water column greater than indicated by DER correspondence;

2). Fueling and ice ha[ve] been relocated at the terminal end of the north finger pier (see attached sheet 2). Additionally, the old proposed fueling dock has been extended to 120 feet to eliminate dredging. This dock shall be utilized as an off loading dock, thereby reducing congestion in the boatslip area . . .

3). A pan shall be placed under the fuel dock in a manner where

200

spillage is expected to be minimized. The harbor master shall be trained in proper techniques of using it as indicated in the original application;

4). A spill boom shall be kept on site and the harbor master shall be trained in proper techniques of. using it as indicated in the original application;

5). Re[n]terating the original application, my client intends to install a central sewage system hooking up to Wakulla Municipal System when available. In the interim, my client will provide holding tanks if the facilities will not be in place. Build out of the marina is expected to coincide with the availability of the central system installation;

6). Trash collection will be provided and the operation monitored by the harbor master;

7). No live aboards shall be allowed. However, transients should be allowed in light of the fact that the marina will provide a safe harbor and the pumpout system will be available; the marina will work well within the mandates imposed by the Department of Natural Resources;

8). Turbidity curtains shall be employed whereas necessary to maintain State Water Quality Standards.

9). The pilings used in the project shall be made of pre-cast concrete, pile driven, where possible, by barge. The piles are indicated on the revised drawings as attached.

DBI's Exhibit No. 2.

In the other letter to which the stipulation refers, DBI made certain proposals to Wakulla County, in a letter Mr. Garlick wrote on DBI's behalf:

Dear Ms. Day:

Thank you for meeting with Segundo Fernandez and I on 9-17-87. As you know, I'm the agent for Dickerson Bayshore, Inc., who proposes to construct a public Maria at the terminus of Rock Landing Road. Through you, we request authorization to perform improvements on county property which will mutually benefit my client's project and the general public. The improvements are as follows:

1) Renovate the public boat ramp providing safer boat launching activities;

2) Construct a stormwater management facility which will direct the

201

first inch of stormwater runoff away from the existing ramp facility incorporating a series of earthen berms and asphalt "speed bumps". This facility's construction would enhance water quality in Dickerson Bay but would not impede the uses of the boat ramp;

3) Provide dumpsites and fish cleaning facilities located on or next to the county public pier, encouraging its use by the general public.

We would see a definite benefit to the public if the county would place the public pier under the management jurisdiction of the project's harbor master. The harbor master would ensure that the same operational requirements of the marina were complied with by persons using the public pier, including use of sewage pumpout and fish cleaning facilities. A copy of our preliminary proposed management scheme is enclosed for your information. In seeking authorization for this management arrangement, we are interested in the commissioner's opinion on supporting the marina's proposed dockmaster in regards to financial and liability aspects.

Another list of information we request involves the sewage facilities in the Rock Landing area:

1) The fact that the sewage installation is being provided to the Rock Landing Area;

2) The capacity to service the proposed marina's sewage pumpout facility and public restrooms;

3) The date of installation and service to the marina.

DBI's Exhibit No. 1.

Evidently the county does not want to hire a harbor master because DBI has indicated its willingness to accept, as a permit condition, the responsibility for employing one full-time harbor master itself. He would not be on site all day, but he would be on 24-hour call, the plan is.

26. The bay bottom is devoid of sea grasses at the site proposed for the marina. At the ends of the main piers, mean low water would range between six and seven feet. In the slips closest to shore, mean low water might be as low as three feet, but only boats drawing two feet or less would be assigned to the near shore slips. (T. 677)

27. DBI had originally proposed to locate the marina in shallower water, which would have required dredging 139 cubic yards of the bay bottom, but the current proposal involves no dredging or filling, except what actually placing the piles would entail. To the extent practicable, piles would be driven, not jetted. No sea wall would surround the marina, but DBI would employ turbidity screens during construction.

### High Flushing Potential

28. Winds, as well as tides, cause water to circulate in Dickerson Bay. So does stormwater runoff. On the basis of a "simplistic drogue study" (T. 354), particle "travel time measurements . . . indicate[d] a mean travel distance of the range of five times the project size dimension." DBI's Exhibit No. 12. The tidal range in Dickerson Bay makes for ". . . high flushing potential," DBI's Exhibit No. 11, although "low to moderate flushing characteristics [may obtain] during various times of the year." *Id.*

29. That fecal coliform counts near the municipal dock area as low as they are suggests that this high flushing potential has been realized. But "bacteriological examination does not, in itself, offer conclusive proof of the sanitary quality of an areas," Joint Exhibit 1, p. 11, not that bacteriological examination suggests sanitary quality at the proposed site.

30. DER's Mr. Echternacht concluded that "in the event of a spill the majority of the components would . . . exit the bay through the dredged . . . channel." DBI's Exhibit No. 12. On outgoing tides, water also leaves the bay through a culvert which leads under the road to Fiddlers Point to Oyster Bay. Since no dye tracer studies have been done, the evidence does not establish how much dilution pollutants will have undergone by the time they reach Class II waters or the oyster beds in the area.

31. On rising tides, pollution entering the water at the marina might move further into the bay. Wherever dispersed, pollutants from the marina would do wildlife no good. Among marina creatures, only barnacles and the like, for whom the concrete would be an additional surface to encrust, would benefit from the proposed marina, as far as the evidence showed.

### Lepidochelys Kempii

32. Now that the Mexican government prohibits gathering their eggs, drowning in shrimpers' nets is the principal threat. DBI's Exhibit No. 5, p. 26, to the survival of the Kemp's ridley (Lepidochelys kempii), "the most endangered of all sea turtles." DBI's Exhibit No. 18, p. 1.

33. Virtually all Kemp's ridleys' nesting takes place along a 30-mile stretch of coast near Rancho Nuevo, tamaulipas, Mexico. In a single day in 1947, naturalists estimate, an *arribada* of 40,000 Kemp's ridleys, also known as "parrot turtles," nested on a beach near Rancho Nuevo, the beach on which it is believed 95 percent of all (adult female) Kemp's ridleys nest. (Adult males gather offshore, but do not leave the

water.) At one time turtle eggs from Rancho Nuevo, which are reputed to be aphrodisiacs, filled trucks bound for Tampico. Between 1978 and 1986, only 500 to 750 Kemp's ridleys a year nested at Rancho Nuevo.

34. Since 1966, the Mexican government has taken extraordinary measures in an effort to protect the eggs the surviving turtles lay. If laid outside a specially designated zone, the eggs are removed to a protected area of the beach, where armed marines stand guard against predators, human and coyote.

35. The Mexican government also permits United States officials to gather about 20 clutches (2,000 to 3,000 eggs) for use in an ongoing experimental effort to establish another breeding ground on Padre Island off the Texas coast. Since it may take as long as 15 years for Kemp's ridleys to attain reproductive capacity, and the experiment was only begun in 1978, it remains to be seen whether the attempt to create another breeding ground will succeed. Jack B. Woody of the U. S. Fish and Wildlife Service believes that "the chance of successfully establishing a second nesting populatio on Padre Island is minimal." DBI's Exhibit No. 17, p. 926.

36. Hatchling ridley turtles or, in the case of the Padre Island program, turtles almost one year old and the size of dinner plates, make their way into the Gulf of Mexico to begin an open sea or pelagic phase, which lasts a year or more for the hatchlings.

37. Although Kemp's ridley sightings along the Atlantic Coast are not uncommon, most ridleys apparently do not leave the Gulf of Mexico region. None have been found in the Caribbean. But they are regularly seen off Cape Canaveral, and 68 were recorded in the Chesapeake Bay from 1979 to 1985. In the winter of 1985-1986 alone, 44 juvenile ridleys were found on the northern shore of Long Island. They have been found off Cape Code, and as far away as Great Britain, the Netherlands, France and the Azores. Whether juveniles who range this far survive to return to the Gulf of Mexico and procreate is not known.

38. "[A]fter they live their first year or so of life in the open sea," (T. 462) Kemp's ridleys, having grown to a length of about eight inches, move in-shore "enter[ing] into a benthic habitat as carnivor[e]s." (T. 463) They feed on blue crabs, in particular. Two "circulation systems in the Gulf, [the] eastern and the western" (T. 464) deposit them in northern Gulf estuaries, notably in Louisiana's Caillou Bay in Terrebone Parish, and in Florida, between Apalachicola Bay and St. Marks. Seasonally Cedar Key has a group of larger but still sub-adult Kemp's ridleys. When fully grown, they migrate to Louisiana where, except during the breeding season, they tend to remain.

39. Petitioner Rudloe is one of several people living along the Gulf Coast with whom the National Marine Fisheries Service has contracted to tag live turtles and collect data on ridleys, dead and alive. (t. 471) He also rehabilitates injured turtles before releasing them into Dickerson Bay. For these services, he receives some $500 per month. Under the contract, his remuneration does not depend on the number of turtles he tags, except to the extent that he pays fishermen the $25 reward he offers for each ridley they bring him, money which would otherwise have been his to keep.

40. Even before Mr. Rudloe entered into the current agreement with the National Marine Fisheries Service in 1983, he occasionally found and tagged juvenile ridleys, but he generally mailed any record he made to Archie Carr, without keeping a copy for himself. The records he does have, DBI's Exhibit No. 16, reflect the tagging of some 94 Kemp's ridleys, taken from the waters of Franklin and Wakulla counties. Almost all of the turtles were eventually released from the Rudloes' dock in Dickerson Bay. Part of the appeal of releasing turtles in Dickerson Bay is the infrequency with which shrimping takes place there.

41. Only one ridley turtle released into Dickerson Bay was recaptured in the immediate vicinity: off Fiddlers Point. The only other ridley released by the Rudloes and later recaptured was taken off Alligator Point. Of the turtles petitioners have tagged and released, 80 had been caught in shrimp nets and 13 were taken with gill nets.

42. Mr. Ogren, the herpetologist, testified to his belief, not yet scientifically demonstrated, that the area or "system" between Ochlockonee Bay and St. Marks was of primary importance to the ridley, being the area in which eastern Gulf currents deposited the juveniles leaving the open seas to prey on blue crabs. Even though the Rudloes report more ridleys in the vicinity of Alligator Point, to the west of Ochlockonee Bay, Mr. Ogren may be right.

43. Information the Rudloes and others have gathered does not reveal what fraction of the juvenile ridley population inhabits Dickerson Bay or nearby waters. Excluding the recaptured individual, perhaps as few as eight were taken off Fiddlers Point, in Levy Bay, or in Dickerson Bay itself, all counted together. More ridleys were consistently taken in the vicinity of Alligator Point, in the three most recent years for which data were presented. Five were taken off Piney Island, a marshy island two to three miles long and a mile wide, which lies less than a mile east of the mouth of Dickerson Bay.

44. The data are, to a significant degree, a function of fishing (mainly

**205**

shrimping) effort. Something on the order of 90 turtles tagged and released in Dickerson Bay were not recovered, as compared to the single turtle who was recaptured there. On the other hand, there have been no reports of ridleys between Cape San Blas and Dauphin Island, despite all the fishing that takes place in those waters, lending some support to Mr. Ogren's hypothesis.

45. Most of the ridleys were taken in less than three feet of water. Ridley turtles are faster than manatees, and more likely to avoid propellers, but collisions between ridleys and boat propellers are not unheard of. While it is clear the main hazard is shrimp trawling, recently effective regulations mandating the use offshore of a trawling efficiency or turtle excluder device (TED), a configuration of metal bars placed at the net's mouth and designed to divert sea creatures larger than shrimp up and over the net, should attenuate the danger of ridleys drowning in shrimpers' nets.

### Mycteria Americana

46. "All kinds of water birds" (T. 306), including cranes, pelicans, herons, egrets, sea gulls, ospreys and wood storks frequent Dickerson Bay and the surrounding area. Although in less abundance than at St. Marks lighthouse or on St. Vincent Island, bald eagles have also been seen in the area.

47. An endangered species, the "highly colonial" wood stork (Mycteria Americana), is also known as the wood ibis, the gannet, and the ironhead. In 1975, the Florida population was put at 12,000. A "probably disjunct" population lives in Mexico and Central America. Although, in the fall of the year, bird watchers have seen migratory flocks of as many as 80 birds in the Big Bend, groups of ten or fifteen wood storks are more common. They pass through for six to eight weeks in the spring and for a like time in the fall.

48. Between Port St. Joe and St. Marks, as far as the evidence shows, the St. Marks lighthouse, Wakulla Beach and the Dickerson Bay area, notably Fiddlers Point, are the only areas where people have seen wood storks or ironheads. In Florida, the wood stork nests mainly in rookeries in the everglades. Wood storks do not nest in the vicinity of Dickerson Bay. The closest known nesting area is in Alachua County.

49. Fisheaters, wood storks are partial to fresh water marshes where they feed in shallow murky ponds "by a specialized technique known as grope-feeding or tacto-location." DBI's Exhibit No. 6. Lacking good vision, they rely on a reflex that snaps their beaks shut when either

mandible encounters a pescine shape. Wood storks require "a concentration of fish into small pools." (T. 956) The clear the water is, the more competition they face for the fish, and the more likely the fish are to "see them coming." (T. 311).

50. Most of the boat traffic in Dickerson Bay is confined to the navigational channel, and extensive shoals make it impossible for many boats to reach Fiddlers Point, but the channel comes within 60 to 70 yards of one major feeding ground. Wood storks are less shy than white ibises but more shy than common egrets. A man on foot can come within 50 meters before wood storks disperse. Mr. Crum, who has lived on or near Dickerson Bay for more than 40 years, has seen work storks on Fiddlers Point but never on the marina site itself.

*Oysters Harvested*

51. Although the site proposed for the marina lies in Class III waters permanently closed to the lawful taking of oysters, oysters abound, and may legally be harvested east of an imaginary line 1700 feet away running between Porter's Island and the tip of Hungry Point. East of the line lie Class II waters approved for shellfishing.

52. West of the line, as well, within the part of Dickerson Bay officially closed to the taking of shellfish, people occasionally harvest oysters, illegality notwithstanding. Mr. Crum himself saw two people in 1986, although he believes the practice has fallen off "since this disease scare of about three years ago, four years ago, the hepatitis deal." (T. 268)

53. Among the stunted "coon" oysters closest to the proposed site are occasional larger ones. Coon oysters are those which a raccoon might eat, but which are not big enough for most oystermen. People "will beat off the smaller oysters and keep the large selects and sell them at the price of $20 a bushel." (T. 910) Oysters three inches long are harvestable commercially.

54. Approximately a mile from the proposed site (T. 274) lies a "relay bed." "[S]ome months ago, DNR planted an oyster bed with the Commercial Fisherman's Association of Fiddlers Point . . . and within a few months . . . they were able to harvest them, and they have sold something like $6,000 worth of oysters." (T. 907-908)

55. The relay bed off Fiddlers Point is the closest large commercial bed, but oyster beds occur throughout the general area. Except for Spring Creek and Panacea Harbor, all marine waters in Wakulla County are designated Class II.

The primary concentration of oyster bars in the region is located in

Oyster Bay with some concentrations off Bald Point. Scattered oyster bars are found in portions of Ochlockonee Bay, Levy Bay, and Dickerson Bay. DBI's Exhibit No. 11, p. 8.

The oysters which "occur on the marine site itself . . . are mostly encrusted around old pilings." DER's Exhibit No. 1. "Coon oysters occur in various portions of the site." DBI's Exhibit No. 11, p. 8; DBI's Exhibit No. 4.

56. An extensive bar of these smallish oysters lies within 100 yards of the marina site, between the proposed site and Hungry Point, and several coon oyster bars lie in other parts of the bay. "[P]eople getting oysters off Hung[]ry Point and around the bay . . . are selling the oysters at R & R Seafoods," (T. 915) presumably for resale. Redfish and other sea creatures eat oysters, too.

### Choctawhatchee Blues

57. After initial precipitation into the sediment, metals such as copper return to the water column with "haphazard periodicity." (T. 761) With oysters "in the region, the movement . . . of these contaminated particles in the water will eventually be concentrated by . . . oysters and . . . [other] shellfish . . . so that you can have an immediate effect when a marina is put in." (T. 762) Near a marina in Choctawhatchee Bay, "the oysters turned blue due to copper contamination, and the oyster beds had to be shut down." (T. 764) The evidence did not disclose whether leaching from treated wooden piles, which DBI's proposal eschews, was part of the problem there.

58. Shrimp can accumulate cadmium in concentrations that exceed background levels 600 fold. Organisms that eat contaminated oysters or shrimp (or who eat predators of contaminated shellfish) should theoretically end up with still higher concentrations of contaminants, but the evidence is incomplete that "biological magnification" of chemical contamination occurs in this context.

59. Another danger of contamination marinas pose for oysters is bacteriological. Todd Campbell, the DER field inspector who evaluated DBI's application, observed:

Raw sewage dumped from boats will increase bacteriological loading into the bay, and tides will surely carry these organisms out into Class II approved waters. This . . . very likely will cause Class II approved areas in Apalachee Bay to be closed to shellfish harvesting. DER's Exhibit No. 1.

DBI proposes to address the problem by building restrooms and a pumpout facility; and by prohibiting live aboards (except "transients")

208

and through-hull discharges from heads. DBI's proposals to impede runoff from its property with a berm, including a "speed bump" on the boat ramp, to build a swale, and to leave a buffer to filter runoff are also intended, in part, to reduce the amount of fecal coliform entering the harbor in stormwater.

*Formulas for Health*

60. Not DER, but Florida's Department of Natural Resources (DNR), has responsibility for opening and closing Florida waters to shellfish harvesting. In these matters, DNR relies on expert personnel in the Shellfish Environmental Assessment Section of the Bureau of Marine Resource Regulation Development of the Division of Marine Resources. When asked by DER to comment on a proposed project, DNR's Shellfish Environmental Assessment Section, unable to take water samples to determine actual concentrations of chemical and biological contaminants, since the marina has not been built, resorts to a national policy, expressed as a formula in an operations manual published by the National Shellfish Sanitation Program.

61. As a member of the Interstate Shellfish Sanitation Conference, Florida helped develop the national "marina classification policy," (T. 527), which addresses the question of how much of "the area in the immediate vicinity of the marina facility must be classified as prohibited" (T. 526) to shellfishing, based on the potential for contamination. In formally promulgatated administrative rules, DNR adopted by reference Parts I and II of the National Shellfish Sanitation Program Manual of Operations (1985 edition), Joint Exhibit No. 1.

62. The 1965 manual purportedly contained a dilution formula grounded on unrealistic but, to some extent, offsetting assumptions: As a worst case, the formula assumes that a boat in every slip simultaneously discharges excrement equivalent to what "1.25 persons" would produce. This implausible assumption may overstate the maximum loading. On the other hand, in assuming that pollutants disperse in all directions uniformly the formula may understate maximum concentrations, which depend on tidal and other currents, and may occur in a narrow plume. A more recent manual, not adopted by reference in DNR's rules, contains a similar formula that assumes two, instead of "1.25" persons. DNR's David Heil characterized it as "only a rough cut, ludicrous, if you will, formula to give a permitting agency an idea of what may be going on." (T. 585)

63. In evaluating DBI's proposal, the Shellfish Enforcement Assessment Section took into account the relative location of the proposed site and of waters approved for shellfish harvesting, "look[ed] at

**209**

average water depths in the area and . . . also look[ed] at applying certain calculations to certain types of dredge and fill activities." (T. 521), *viz.,* marinas. The EPA suggests that no marina be located within 2,000 feet of a producing oyster bed, but "it is merely a benchmark. You would have to look at the current structure." (T. 793)

64. Applying the more recent and conservative national shellfish sanitation formula, DNR would, if the first phase of the marina DBI proposed were now in existence, close to shellfishing all waters within "4,268 feet, .81 miles [of the marina]; additional closure of the now approved areas: 2,586 feet, .49 miles," (T. 581) based on "40 slips" at the municipal dock and 40 new slips. (T. 581)

65. Applying the older and less conservative formula, and taking into account only the effects of phase one, assuming 40 boats at the existing dock, would still require closure of "3,338 feet from the marina, or from the proposed project, outwards," (T. 584) including waters stretching 1,688 feet east of the Class II boundary line. In fact, the more conservative formula dictates closing to shellfish harvesting waters up to a quarter mile beyond the Class II boundary line, even on the assumption of only "40 boats . . . at the current docking facility." (T. 574)

66. If 79 slips were added to these 40, DER would close to shellfish harvesting all waters within a radius approaching a mile: "5,228 feet, or .99 miles." (T. 581) No evidence suggested that DBI would add more than 71 slips, however. On DBI's assumptions, that every boat that would otherwise dock at the municipal pier, will instead moor at the marina, DNR would, if 71 slips were built, close waters within a radius of .76 miles.

67. Recognizing that rainstorms may lead to violations of CLass II fecal coliform standards, regardless of how many boats are moored at the municipal dock, DNR already closes some waters east of the line to shellfish harvesting, when rainfall is heavy.

68. DBI requires not only a DER permit, but also a lease of state-owned bay bottom, in order to build the marina it proposes. DNR's Shellfish Enforcement Assessment Section has commented unfavorably on the DER permit application and, in keeping with DNR's "philosophy of resource management and public health protection," (T. 585-586), will recommend to DNR's Division of State Lands that DNR deny DBI a lease to construct the marina. What DNR's Division of State Lands would recommend to the Governor and Cabinet was not shown.

210

69. If the marina were built, DNR would close waters to shellfishing that are now approved, but would review the situation, based on work done on site, after its staff had performed certain tests. DNR's field work, like the formulas it uses, has a scatological predicate. In evaluating pollution from marinas, DNR's experts focus on fecal coliform, both as a proxy for certain pathogenic microorganisms, and in keeping with the accepted view that biological pollution ordinarily poses a threat further away from marinas than chemical pollutants are likely to.

70. Crucial in DNR's evaluation is assessing how much dilution will occur by the time water moves from a marina into the area designated Class II, approved for shellfish harvesting.

> It is well established that shellfish from water having a median coliform MPN not exceeding 70 per 100 ml. *and which is also protected against chance contamination with fecal material,* will not be involved in the spread of disease which can be attributed to initial contamination of the shellfish. This is not surprising since a water MPN of 70 100 ml. is equivalent to a dilution ratio of about 8 million cubic feet of coliform-free water per day for the fecal material from each person contributing sewage to the area. This tremendous volume of water is available in shellfish growing areas through tidal action which is constantly bringing unpolluted water into the area.

> Areas which are approved for direct market harvesting of shellfish which will be eaten raw must necessarily meet one general test; i.e. sewage reaching the growing area must be so treated, diluted, or aged that it will be of negligible public-health significance. This implies an element of time and distance to permit the mixing of the sewage or fecal material with the very large volume of diluting water and for a major portion of the microorganisms to die out. Joint Exhibit No. 1 (emphasis in original; footnote omitted.)

For its purposes, DNR insists on real life water samples and does hydrographic studies on site.

71. The hydrographic studies entail dye tracers, which give precise information about dilution under the conditions obtaining when the test is done.

> Preliminary information has to be gathered through drogue studies to determine average velocities, and maximum and minimum water

velocities. Transects need to be run to determine average water depths. Volumetric calculations from there are determined. (T. 531)

Dyes are then released. Unless test conditions are the worst foreseeable, DNR extrapolates to the "worse case":

Based on dilutional calculations, [DNR] would . . . look at worse case scenarios, what can occur and what does occur, and the same with actual scientific studies, [DNR would] . . . look at the worst case situation applied to a worse case tracer study. (T. 585)

DNR's experts insist these tests be performed, in order to determine whether shellfish harvesting can be done safely.

72. Unlike the simple drogue studies from which several witnesses inferred good flushing of the proposed marina site, or the monitoring stations designed to identify sources of pollution, dye tracer studies assume a pollution source in order to forecast concentrations of pollutants as they move through the water. Crews in DNR's Shellfish Enforcement Assessment Section conduct hydrographic studies with tracer dyes routinely. They try to perform studies under extreme conditions of weather and tide in order to learn the effects of maximum flows. Even without precise information about loading rates, dye tracer tests can make meaningful sensitivity analysis possible.

73. If DER required that an applicant for a permit to construct a marina, in close proximity to Class II waters approved for harvesting shellfish, perform dye tracer tests, as part of giving reasonable assurance that such waters would meet DER's water quality standards, DER would have the same capability DNR has for deciding the same question DNR decides, when it evaluates Class II waters approved for harvesting shellfish.

74. In determining whether to open waters for the harvesting of shellfish, DNR makes its decision by

identifying actual [or] potential pollution sources that may be close enough to shellfish harvesting waters to render them unsafe for human consumption; number two, the hydrographics of the area, to determine the distribution and transport of those pollution sources; and then the sampling program. (T. 549)

Of course, sampling could not be determinative if the pollution source were potential, instead of actual. Before a marina opens, the precise amounts of pollutants it will add to the water are, to some extent, a matter of conjecture.

75. Planned restrooms and pumpout facility notwithstanding, uncertainty exists in the present case, as well. (T. 807) "Transient" live

aboards are contemplated. The harbor master is to require boats capable of discharging their heads to lock through hull discharge valves. (Evidence at hearing dispelled ambiguity in the language proposed as a permit condition: boats are not to be barred from the marina just because their heads can be made to discharge to surrounding waters.) But the harbor master will not be present around the clock, to ensure that boaters leave boats on stormy nights for the public restrooms, or be able to guarantee that the heads stay locked.

76. The ameliorative influence of restrooms and pumpout facility is also problematic. As Mr. Crum observed:

> [I]t is going to be a lot of problems, it's not going to be that you are going to put a dockmaster there or a harbor master and have this thing converted overnight, because these people have been doing it all their lives. (T. 238)

Some boat owners would undoubtedly choose to remain at the municipal dock free of charge, rather than rent a slip at a new marina. The plan is that the harbor master would help bring order at the municipal dock, too, by enforcing ordinances, not yet adopted. But it is not clear how well this would work.

### Identical Standard, Philosophical Differences

77. The fecal coliform standard DER water quality rules lay down for Class II waters is precisely the same standard DNR applies in approving waters for shellfish harvesting. In evaluating DBI's application, both DER and DNR must assess the risk of contamination in Class II waters now approved for shellfish harvesting. Foreseeable conditions, if the marina is built, include increased fecal coliform loading 1700 feet away in waters where high background levels have persisted for years.

78. Although DNR and DER use identical fecal coliform standards, the two agencies may view them differently, as Mr. Heil's answers to Ms. Brodeen's questions illustrated:

> Q. Are DNR concerns as to fecal [coliform] and other contaminants, more toward guarantee than reasonable assurances?
>
> A. Absolutely. Our public health responsibilities require that we are absolutely sure of our actions when we do this.
>
> The consumer demands a lot more from its regulatory agencies that are responsible for the protection of the public health. And here are potential injuries done by consuming shellfish.
>
> Shellfish are consumed raw, partially cooked, and even if cooked pathogenic organisms are not totally dematured in all uses.

Q. So your standard is much more stringent than DER's reasonable assurance standard, as far as fecal [coliform] is concerned?

A. . . . If it exceeds it, it exceeds it.

But if you're going to allow some violation of it, reasonably or unreasonably, whatever the case may be, the consequences are so much greater when the public health is being jeopardized, than if the water quality for natural resource concerns and protection and maintenance of a designated usage . . .

A. The standard is the same. How you apply the standard, I think, is probably a little different.

Q. But you don't have a reasonable assurance standard? You have the worst case scenario, right, which is more towards the absolute guarantee?

A. Right. The word, "reasonable" to us, or to an agency charged with the protection of public health, may imply that it is possible, so a guarantee would be what we would be looking at us a, at least, a guarantee that can be documented, enforced, that type of thing. (T. 576-578)

DER requires reasonable assurance, not an absolute guarantee, that water quality standards will not be violated. But, in assessing the risk, DER's rules require that DER, like DNR, assume a worst case scenario, if such a scenario is reasonable foreseeable, since DER's rules require reasonable assurance that pollution in violation of water quality standards will not occur, under reasonably foreseeable conditions.

## CONCLUSIONS OF LAW

When DER transmitted the objectors' petition, in accordance with Section 120.57(1)(b)3., Florida Statutes (1987), the Division of Administrative Hearings assumed jurisdiction of formal adminstrative proceedings on DBI's application for a permit to construct a marina.

### Burden on Applicant

DBI has applied for a permit to construct a marina because Section 403.087, Florida Statutes (1987) forbids construction without a permit. Under DER rules, the

Department may issue such permits only after it is assured that the installation will not cause pollution in violation of any of the provisions of Chapter 403, F.S., or the rules and regulations promulgated thereunder. Rule 17-4.030, Florida Administrative Code.

As the applicant, DBI has the burden to prove entitlement to the

permit it seeks. The courts view it "as fundamental that an applicant or a license or permit carries 'the ultimate burden of persuasion' of entitlement through all proceedings, of whatever nature, until such time as final action has been taken by the agency." *Department of Transportation v J.W.C. Co, Inc.,* 396 So.2d 778, 787 (Fla. 1st DCA 1981). See *Zemour, Inc. v State Division of Beverage,* 347 So.2d 1102 (Fla. 1st DCA 1977) (lack of moral character found "from evidence submitted by the applicant"). See generally *Balino v Department of Health and Rehabilitative Services,* 348 So.2d 349 (Fla. 1st DCA 1977).

The statutory criteria which govern DBI's application are set out in the Warren S. Henderson Wetlands Protection Act of 1984, as follows:

(1) A permit may not be issued under §§ 403.91-403.929 unless the applicant provides the department with reasonable assurance that water quality standards will not be violated. The department, by rule shall establish water quality criteria for wetlands within its jurisdiction, which criteria give appropriate recognition to the water quality of such wetlands in their natural state.

(2) A permit may not be issued under §§ 403.91-403.929 unless the applicant provides the department with reasonable assurance that the project is not contrary to the public interest. However, for a project which significantly degrades or is within an Outstanding Florida Water, as provided by department rule, the applicant must provide reasonable assurance that the project will be clearly in the public interest.

(a) In determining whether a project is not contrary to the public interest, or is clearly in the publicinterest, the department shall consider and balance the following criteria:

1. Whether the project will adversely affect the public health, safety, or welfare or the property of others;

2. Whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

3. Whether the project will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

4. Whether the project will adversely affect the fishing or recreational values or marine productivity in the vicinity of the project;

5. Whether the project will be of a temporary or permanent nature;

6. Whether the project will adversely affect or will enhance signifi-

cant historical and archaeological resources under the provisions of § 267.061; and

7. The current condition and relative value of functions being performed by areas affected by the proposed activity.

(b) If the applicant is unable to otherwise meet the criteria set forth in this subsection, the department, in deciding to grant or deny a permit, shall consider measures proposed by or acceptable to the applicant to mitigate adverse effects which may be caused by the project. If the applicant is unable to meet water quality standards because existing ambient water quality does not meet standards, the department shall consider mitigation measures proposed by or acceptable to the applicant that cause net improvement of the water quality in the receiving body of water for those parameters which do not meet standards.

Implementing the statute is Rule 17-12.070, Florida Administrative Code, which provides in pertinent part:

(1) In accordance with Section 403.918(1), F.S., no permit shall be issued unless the applicant has provided the department with reasonable assurance based on plans, test results or other information that the proposed dredging or filling will not violate water quality standards.

(2) No permit shall be issued unless the applicant provides the department with reasonable assurance based on plans, test results or other information that the project is not contrary to the public interest in accordance with Section 403.918(2), F.S.

(3) No permit shall be issued for dredging or filling which significantly degrades or is within an outstanding Florida Water unless the applicant complies with Section 403.918(2), F.S., and Rule 17-4.242, F.A.C.

(4) A permit may contain specific conditions reasonably necessary to assure compliance with Section 403.918, F.S.

(5) The department may deny a permit in accordance with Section 120.60, F.S., if the applicant, after receiving written notice from the department of intent to deny the permit for failure to provide requested information or to publish a required notice, fails to correct errors or omissions, or to supply the additional information or to publish a required public notice within the time set forth in the notice of intent to deny the permit.

(6) Applications for dredging or filling in Class II waters approved for shellfish harvesting shall be issued or denied in accordance with

Rule 17-4.280(8)(a), F.A.C. The department shall deny a permit for dredging or filling in Class II waters not approved for shellfish harvesting unless the applicant submits a plan or proposes a procedure for conducting those activities so as to provide adequate protection of and to prevent significant damage to the immediate project area and areas in the vicinity of the dredging or filling in any class of waters where the proximity of such dredging or filling to Class II waters would be expected to have a negative impact on Class II waters and where reasonable assurance has not been provided that the dredging or filling will not result in violations of the applicable provisions of Chapter 17-3, F.A.C., in Class II waters.

Rule 17-4.280(8), Florida Administrative Code, to which the foregoing rule refers, provides:

(8)(a) The department recognizes the special value and importance of Class II waters to Florida's economy as existing or potential sites of commercial and recreational shellfish harvesting and as a nursery area for fish and shellfish. Therefore, it shall be the department's policy to deny applications for permits or certifications for dredging or filling activities in Class II waters, except where the applicant has submitted a plan of procedure which will adequately protect the project area and areas in the vicinity of the project from significant damage. The department shall not issue a permit for dredging or filling directly in areas approved for shellfish harvesting by the Department of Natural Resources. Provided, however, that the staff of the department may issue permits or certifications for maintenance dredging of existing navigational channels fr the construction of coastal protection structures and for the installation of transmission and distribution lines for carrying potable water, electricity or communication cables in rights-of-way previously used for such lines.

(b) The department shall also deny applications for permits or certifications for permits or certifications for dredging and/or filling activities in any class of waters where the proximity of such activities to Class II waters would be expected to have an impact on the Class II waters, and where reasonable assurance has not been provided that the activities will not result in violations of the applicable provisions of Chapter 17-3, Florida Administrative Code, in the Class II waters.

Rule 17-4.280(8)(b), Florida Administrative Code, applies only to certain dredge and fill applications completed and received before October 1, 1984, since Rule 17-12.070(6), Florida Administrative Code, incorporates by reference subsection (8)(a) but not subsection (8)(b).

But the Warren S. Henderson Wetlands Protection Act of 1984 requires that a permit applicant give "reasonable assurance that water quality standards will not be violated," Section 403.918(1), Florida Statutes (1987), without regard to where the pollution source is located. See also Rule 17-12.070(6), Florida Administrative Code. DER cannot permit a stationary installation in Class III waters, absent reasonable assurance that it will not cause water quality violations in Class II waters nearby. Even if DBI did not require a dredge and fill permit to place the piles for the marina it proposes, "the remaining facilities of the proposed project are stationary installations that can reasonably be expected to be a cause of pollution for which a DER permit must be obtained." *Boca Grande, Inc. v Department of Environmental Regulation*, 9 FALR 887, 889 (FDER 1987).

Here, although DBI proposes to build the marina in Class III waters, the site lies within 1700 feet of Class II waters approved for harvesting shellfish. In its rules, DER explains the significance of its water quality classifications:

(4) The present and future most beneficial uses of all waters of the State have been designated by the Department by means of the classification system set forth in this Chapter pursuant to Subsection 403.061(10), F.S. Water quality standards are established by the Department to protect these designated uses.

(5) Pollution which causes or contributes to new violations of water quality standards or to continuation of existing violations is harmful to the waters of this State and shall not be allowed.

(6) The quality of waters which exceeds the minimum quality necessary to support the designted use of those waters shall be protected and enhanced. Rule 17-3.011, Florida Administrative Code.

Surface waters in Classes I, II and III "share water quality criteria established to protect recreation and the propagation and maintenance of a healthy, well-balanced population of fish and wildlife." Rule 17-3.081(4), Florida Administrative Code. Water quality criteria are specified for each classification, although all surface waters must meet certain minimum water quality criteria, including those set out in Rule 17-3.051, Florida Administrative Code.

The latter provision requires that all surface waters "be free from . . . man-induced . . . discharges which"

(a) Settle to form putrescent deposits or otherwise create a nuisance; or

218

(b) Float as debris, scum, oil, or other matter in such amounts as to form nuisances; or

(c) Produce color, odor, taste, turbidity, or other conditions in such degree as to create a nuisance; or

(d) Are acutely toxic; or

(e) Are present in concentrations which are carcinogenic, mutagenic, or teratogenic to human beings or to significant, locally occurring, wildlife or aquatic species; or

(f) Pose a serious danger to the public health, safety, or welfare.

Rule 17-3.051(1), Florida Administrative Code.

The rules specifically address other pollutants associated with marinas, specifying maximum allowable concentrations for each water quality classification. In all surface waters, zinc in concentrations of one milligram per liter, lead in concentrations exceeding 0.05 milligrams per liter, and oils and greases exceeding 0.05 milligrams per liter, and oils and greases exceeding 5.0 milligrams per liter are forbidden. Rule 17-3.061(3)(i) and (k), Florida Administrative Code. "No undissolved oil, or visible oil defined as iridescence, shall be present so as to cause taste or odor, or otherwise interfere with the beneficial use of [surface] waters [in Florida]." Rule 17-3.061(3)(k), Florida Administrative Code.

For Class III waters, Rule 17-3.121, Florida Administrative Code, provides:

(5) Bacteriological Quality — fecal coliform bacteria shall not exceed a monthly average of 200 per 100 ml of sample, nor exceed 400 per 100 ml of sample in 10 percent of the samples, nor exceed 800 per 100 ml on any one day, nor exceed a total coliform bacteria count of 1,000 per 100 ml as a monthly average, nor exceed 1,000 per 100 ml in more than 20 percent of the samples examined during any month, nor exceed 2,400 per 100 ml at any time. Monthly averages shall be expressed as geometric means based on a minimum of 10 samples taken over a 30 day period. Either MPN or MF counts may be utilized.

* * *

(7) Biological Integrity — the Shannon—Weaver diversity index of benthic microinvertebrates shall not be reduced to less than 75 percent of established background levels as measured using organisms retained by a U. S. Standard No. 30 sieve and, in predominantly fresh waters, collected and composited from a minimum of three Hester-Dendy type artificial substrate samplers of 0.10 to 0.15

**219**

m area each, incubated for a period of four weeks; and, in predominantly marine waters, collected and composited from a minimum of three natural substrate samples, taken with Ponar type samplers with minimum sampling area of 225 square centimeters.

\* \* \*

(9) Cadmium—shall not exceed 5.0 micrograms per liter in predominantly marine waters.

\* \* \*

(11) Copper—shall not exceed .015 milligrams per liter in predominantly marine waters; shall not exceed . . . .

\* \* \*

(13) Dissolved Oxygen— . . . In predominantly marine waters, the concentration shall not average less than 5 milligrams per liter in a 24-hour period and shall never be less than 4 milligrams per liter. Normal daily and seasonal fluctuations above these levels shall be maintained in both . . .

For Class II waters, Rule 17-3.111, Florida Administrative Code, provides, with respect to bacteriological quality, that

the median coliform MPN (Most Probable Number) of water shall not exceed seventy (70) per hundred (100) milliliters, and not more than ten percent (10%) of the samples shall exceed a MPN of two hundred and thirty (23) per one hundred (100) milliliters.

The fecal coliform bacterial level shall not exceed a median value of 14 MPN per 100 milliliters with not more than ten percent (10%) of the samples exceeding 43 MPN per 100 milliliters.

rule 17-3.111(3), Florida Administrative Code.

Class II marine waters have the same criteria for cadmium, copper, and dissolved oxygen as those set out above for Class III. Rule 17-3.111(6), (8) and (10), Florida Administrative Code. The Class II standard for biological integrity is:

(4) Biological Integrity—the Shannon-Weaver diversity index of benthic macroinvertebrates shall not be reduced to less than 75% of established background levels as measured using organisms retained by a U. S. Standard No. 30 sieve and collected and composited from a minimum of three natural substrate samples, taken with Ponar type samplers with minimum sampling areas of 225 square centimeters.

Rule 17-3.111, Florida Administrative Code.

In marina cases, water quality standards need not be met "within the project site rather than within the reasonably contiguous area." *Grove Isle, Ltd. v Bayshore Homeowners' Ass'n, Inc.,* 418 So.2d 1046, 1049 (Fla. 1st DCA 1982).

## Public Interest

An applicant for a dredge and fill permit must give reasonable assurance that the project is not contrary to the public interest. In balancing the public interest criteria, the clash of private interests need not be ignored. DER's rules provide:

(12) Public interest shall not be construed to mean only those activities conducted solely to provide facilities or benefits to the general public. Private activities conducted for private purpose may also be in the public interest.

Rule 17-3.011, Florida Administrative Code.

But the focus of the inquiry is environmental. Whether or not the project would revitalize Panacea's economy, as DBI contends, is immaterial under *Miller v State Department of Environmental Regulation,* 504 So.2d 1325 (Fla. 1st DCA 1987).

A new marina at the proposed site or anywhere in the general vicinity would be no boon for turtles or birds. But the evidence fell short of a showing that chances for the survival of the Kemp's ridleys or of Florida's wood storks would be significantly affected, if DBI builds the marina it proposes. Among wildlife in the area, shellfish would probably suffer the greatest impact.

The marina would be permanent, but would not adversely affect navigation or the flow of water or cause harmful erosion or shoaling. The stormwater containment measures DBI proposes would tend to prevent further erosion alongside the boat ramp. The marina would have no effect on historical or archaeological resources. The bottom at the proposed site is already disturbed, and would not be dredged.

The marina would create additional opportunities for boating, but would make it unsafe (or more unsafe) to take oysters near the site. Just how near and how many oysters are unclear. In the absence of reasonable assurance that water quality criteria will be met, the public interest criterion is not determinative, in any event.

## Reasonable Assurance

Many of the water quality criteria laid down by DER's rules specify maximum allowable concentrations of pollutants. Maximum concentra-

tions are not average concentrations. They are limits which are not to be exceeded. In order for a permit applicant to give reasonable assurance that a proposed project will conform to such water quality criteria, the applicant must demonstrate that violations are unlikely, even in the worst case that can reasonably be foreseen.

When it evaluates pollution effects on waters, whether or not approved for shellfish harvesting, DER's rules require consideration of "worst case scenarios," if it is reasonable to assume that such scenarios will occur. An applicant must show that a violation would not be likely, under the worst, reasonably foreseeable conditions. An applicant need not demonstrate that a violation would be a scientific impossibility, only that its nonoccurrence is reasonably assured. Whether assurance is reasonable depends, in part, on what additional steps might be taken to illuminate the question. What additional tests might reveal and the cost of performing them also enter in.

### Water Quality

The weight of the evidence established that dissolve oxygen levels would not sink below Class III standards or have any significant effect on Class II waters. The objectors proved that copper, lead and other metals would enter the water column, be precipitated into the sediment, accumulate, then return to the water columnn sporadically, possibly in greater concentrations than ever originally introduced. Neither the applicant nor the objector furnished any quantitative information, however. Quantification would not, in any event, eliminate the uncertainty arising from *Grove Isle's* "reasonably contiguous area" formulation.

Testimony that episodic violations of the lead standard would occur assumed, contrary to fact, that the marina would dispense leaded fuel. Spill booms should be able to confine oil slicks or other debris that might constitute a nuisance within "a reasonably contiguous area." *Grove Isle, Ltd. v Bayshore Homeowners' Ass'n, Inc.,* 418 So.2d 1046, 1049 (Fla. 1st DCA 1982).

Petitioner gave reasonable assurance that the biological integrity standard would be met, although the evidence on this point was in conflict. Particularly if piles were jetted in, turbidity screens would contain suspended matter within a "reasonably contiguous area." 418 So.2d at 1049.

With respect to fecal coliform, the applicant's case rests on the premise that the sewage pumpout facility and the restroom the applicant proposed will prevent and even diminish the amount of raw

222

sewage entering the water in the immediate vicinity. The evidence certainly did not rule out this possibility. But neither is it unreasonable to believe that doubling or trebling the number of slips in the area will increase the amount of human feces entering the water.

Whether the fishermen now using the municipal dock defecate in the water there or empty their buckets overboard at dockside was not shown. If either has become their habit, however, the availability of a bathroom at the new marina might or might not change such habits. To assume that it would, and that every new boater lured by the additional slips would faithfully comply with rules designed to avoid sewage in the water is, in the view of people regulating for the public health, too much to assume. Nothing in the evidence explains why it is not also too much for those regulating water quality to assume. It is to be hoped for, of course, but hope cannot serve in reasonable assurance's stead.

DNR's fecal coliform standard for Class II waters is identical to DNR's standard for approving waters for the harvesting of shellfish, and each agency is charged with evaluating the effects of a marina with regard to the standard. Ultimately, DNR's approach to the problem depends on taking water samples once a marina is built. Of course, this option is not available to DER, which must evaluate the effects before they occur. But the second aspect of DNR's methodology is available to DER: dye tracer studies.

Would a single person's "average fecal contribution" cause a violation of the standard? Would it take ten such "contributions" or 100? Without the results of dye tracer studies, the evidence does not answer these questions. With the loading rate unknown, such studies cannot provide the whole answer, to be sure. But, by definitely demonstrating the extent of dilution by the time fecal coliform and other pollutants reach the Class II boundary, the tests can make meaningful analysis possible.

In *Boca Grande, Inc. v Department of Environmental Regulation,* 9 FALR 887 (FDER 1987) an existing marina sought a permit to add 25 sips. Hearing Officer Ruff found:

> Sewage pump-out equipment is available at the fuel dock and a portable sewage pumping facility is available to be moved to each slip as necessary. Boca Grande Club employs a full time dock master who lives aboard a boat at the existing facility.

DBI has proposed comparable, if somewhat less formidable, safeguards. In the *Boca Grande* case, however, DER decided that reasonable assurance had not been given as regards fecal coliform:

223

A subsantial issue has been raised in this proceeding concerning water quality as it relates to the bacteriological standard. It has been established that this marina is presently a source of discharge of fecal coliform organisms which frequently are present in sufficient concentrations so as to violate the standard for that organism for Class II waters. Fecal coliform bacteria are accumulated in the bodies of shellfish. The shellfish themselves are not harmed, but contaminated shellfish can accumulate concentrations of as much as 100 times the ambient fecal coliform bacterial levels present in the waters they inhabit. Fecal coliform bacteria can cause extreme illness in human beings, sometimes even paralysis and death. Fecal coliform bacteria in State waters results from the deposition therein of human or animal waste. The Petitioner maintains a sewage pumpout station located at its fuel dock with a direct connection to its sanitary upland sewer system, as well as a portable sewage pump that can be moved to each boat slip for pumping out of toilets or "heads" on boats. Upland fish cleaning stations will additionally be provided with the proposed docks so as to prevent refuse from fish cleaning activities being deposited into the waters of the cove. The fact remains, however, that there presently exist high levels of fecal coliform organisms in the waters of the cove at the marina site, in the above noted violative concentrations on repetitive occasions. The presence of boats moored in the marina with "heads" aboard are a known discharge source of fecal coliform organisms. The Petitioner proposes to restrict boats using the facility to those boats without marine heads aboard or requiring those with heads to keep them locked or otherwise not discharge them into the waters of the marina. If boats utilizing the marina have toilets aboard, however, there is a substantial likelihood that at some point those toilets will be discharged into the waters of the cove before any of the Petitioner's monitoring personnel are aware of it. The problem is thus one of enforcement. In this regard, it is established that even with the sewage pumpout station and the portable sewage pumpout device, that there are a number of "live-aboard" boats with marine heads in the marina at the present time and customarily. This has caused the above found violations of fecal coliform, Class II water standards. Although the Petitioner proposes to restrict boats at the proposed docking facility to those less than 25 feet in length and to establish a monitoring program by the marina management personnel to assure that the boats with heads only contain heads approved by Coast Guard regulation, reasonable assurances have still not been established that the enforcement plan proposed can be effective in ensuring that no marine heads or other sources of coliform bacteria will

224

be discharged into the waters of the cove at the project site. The plan proposed by the Petitioner simply did not ensure that boats having marine heads will not use the marina and that those persons using boats so equipped will not, on some occasions, discharge the heads into the waters of the marina at the project site nor that spills will not result in the sewage pumping-out process.

In the present case, too, petitioner has failed to give reasonable assurance that the proposed marina would not violate fecal coliform standards in Class II waters.

DER is not found to follow DNR's public health protocol slavishly, by making the same drastically conservative loading assumptions, or otherwise. But, especially, since it must gauge the situation beforehand, DER should insist on acquiring all reasonably accessible information before deciding. DER's Rule 17-3.011(13) provides:

The [Environmental Regulatory] Commission, recognizing the complexity of water quality management and the necessity to temper regulatory actions with the technological progress and the social and economic well-being of people, urges, however, that there be no compromise where discharges of pollutants constitute a valid hazard to human health.

In recognition of the "complexity of water quality management" DER's less expert staff should not dismiss DNR's tracer dye methodology as unreasonable or unnecessary. With a northwest wind and an ebb tide, or with appropriate extrapolation, dye tracer tests would allow DER to judge, with the same precision DNR does, the likelihood that pollution in violation of DER rules would cross the same distance to reach Class II waters.

The applicant in *Leisey Shellpit, Inc. v State of Florida Department of Environmental Regulation,* 9 FALR 2814 (DER; June 15, 1987), who, like DBI, sought to build a marina in Class III waters, but in close proximity to Class II waters, also proposed measures to minimize adverse water quality effects.

Petitioner's plans for the operation of the marina include a prohibition against live aboards and a "no-head" policy. Fueling at the upland fuel pump will be encouraged by a price differential. The upland fuel storage tanks are to be protected by barriers and earthen berms. The water side fueling facility is to be protected by a containment boom. In the event of a fuel spill, it is contemplated that the entire marina can be sealed off from outside waters . . . It is contemplated that a dockmaster or assistant will be on-site at the

225

marina to ensure compliance with all rules and to handle any emergencies that may arise.

9 FALR at 2822-3.

Hearing Officer Tremor found, in the *Leisey Shellpit* case that, if the marina there proposed were built, DNR would

establish a buffer zone outward from the marina which . . . could be prohibited for the harvesting of shellfish.

. . .[T]he size of the buffer zone would be hundreds, thousands of yards. *It is the policy of the DER to deny a request for variance if the proposed project would result in DNR closing an area previously approved for shellfish harvesting.* Water approved for shellfish harvesting are classified by DER as Class II waters.

9 FALR at 2821. (emphasis supplied).

DER denied the application for permit and variance sought in *Leisey Shellpit,* in part on account of the DER policy recited above. DER's rules flatly forbid dredging directly in Class II waters approved for shellfish harvesting. The site here is only 1700 feet removed from such waters. The permit DBI seeks should not issue in the absence of results of dye tracer tests like those DNR routinely performs, results which demonstrate that violation of fecal coliform standards in nearby Class II waters is unlikely, under reasonable foreseeable conditions.

It is, accordingly,

RECOMMENDED:

That DER deny DBI's application for a permit to construct a marina in Dickerson Bay.

DONE and ENTERED this 25th day of April, 1988, in Tallahassee, Florida.